No. 15-2469

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

————————————————

**MIA MASON**,
*Plaintiff-Appellant,*

**v.**

**MACHINE ZONE INC.**,
*Defendant-Appellee.*

————————————————

On Appeal from the United States District Court
For the District of Maryland
Case No. 0:15-cv-01107-JKB
The Honorable James K. Bredar

---

## PLAINTIFF-APPELLANT'S OPENING BRIEF

---

Ryan D. Andrews
randrews@edelson.com
Roger Perlstadt
rperlstadt@edelson.com
Alexander G. Tievsky
atievsky@edelson.com

EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370

*Counsel for Plaintiff-Appellant*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed R. App. P. 26.1 and Local Rule 26.1, Plaintiff-Appellant Mia Mason makes the following disclosure statement:

1. Is party or amicus a publicly held corporation or other publicly held entity? No.

2. Does party/amicus have any parent corporations? No.

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? No.

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? No.

5. Is party a trade association? No.

6. Does this case arise out of a bankruptcy proceeding? No.

Dated: February 1, 2016                    s/ Alexander G. Tievsky

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................ii

TABLE OF CONTENTS ...........................................................iii

TABLE OF AUTHORITIES..........................................................v

JURISDICTIONAL STATEMENT.....................................................2

ISSUE PRESENTED FOR REVIEW .................................................3

STATEMENT OF THE CASE ......................................................4

   I.   Game of War and the Game of War Casino...................................4

   II.  Maryland's Loss-Recovery Statute. .....................................8

   III. Ms. Mason's Experience and the Proceedings Below...................11

SUMMARY OF THE ARGUMENT........................................................13

STANDARD OF REVIEW .........................................................14

ARGUMENT........................................................................14

   I.   The Game of War Casino Is a Gaming Device. ...........................16

      A.   The Game of War Casino is a "wheel of fortune".....................17

      B.   The Game of War Casino is a game at which things of value
            are gambled...................................................18

        1.   Casino Chips have real-dollar value attached to them........19

        2.   Casino Chips represent purchased amusement, which
            is itself a thing of value.......................................22

3.   Casino Chips are "bet, wagered, or gambled"........................ 28

II.  Ms. Mason Lost Money at the Game of War Casino.................... 30

CONCLUSION ............................................................................. 32

REQUEST FOR ORAL ARGUMENT ...................................................... 32

CERTIFICATE OF COMPLIANCE ......................................................... 34

ADDENDUM ............................................................................... 35

CERTIFICATE OF SERVICE ............................................................... 37

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Kimberly-Clark Corp.*,
   507 F. App'x 927 (Fed. Cir. 2014) ..................................................... 7

*Ballock v. State*,
   20 A. 184 (Md. 1890) ....................................................... 15

*Cates v. State*,
   320 A.2d 75 (Md. Ct. Spec. App. 1974) ........................................... 9

*Chesapeake Amusements, Inc. v. Riddle*,
   766 A.2d 1036 (Md. 2001) ............................................... 23

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*,
   526 U.S. 687 (1999) .......................................................... 31

*Clerk of Circuit Court v. Chesapeake Beach Park, Inc.*,
   248 A.2d 479 (Md. 1968) .......................................... 19, 23

*Exxon Mobil Corp. v. Albright*,
   71 A.3d 30 (Md. 2013) .................................................. 20

*F.A.C.E. Trading, Inc. v. Todd*,
   903 A.2d 348 (Md. 2006) .........................................*passim*

*Fosler v. Panoramic Design, Ltd.*,
   829 A.2d 271 (Md. 2003) ................................................ 20

*Gaither v. Cate*,
   144 A. 239 (Md. 1929) ...........................................*passim*

*Goldfarb v. Mayor & City Council of Balt.*,
   791 F.3d 500 (4th Cir 2015) .......................................... 14

*Helton v. Hunt,*
    330 F.3d 242 (4th Cir. 2003) ......................................................... 21

*Hook v. Boteter,*
    3 H. & McH. 348 (Md. 1793) ...................................................... 20

*Kramer v. Bally's Park Place, Inc.,*
    535 A.2d 466 (Md. 1988) ......................................................... 9, 14

*Philips v. Pitt Cty. Mem'l Hosp.,*
    572 F.3d 176 (4th Cir. 2009) ........................................................ 7

*State v. 158 Gaming Devices,*
    499 A.2d 940 (Md. 1985) ........................................................ 20, 23

*State v. Crescent Cities Jaycees Found., Inc.,*
    624 A.2d 955 (Md. 1993) ............................................................ 23

*State v. Smith,*
    117 A.3d 1093 (Md. 2015) ........................................................... 22

*United States v. Armstead,*
    524 F.3d 442 (4th Cir. 2008) .................................................... 20, 22

*United States v. Moore,*
    769 F.3d 264 (4th Cir. 2014) ...................................................... 22

## Statutory Provisions

28 U.S.C. § 1291 ............................................................................. 1

28 U.S.C. § 1332 ............................................................................. 1

Md. Code, Crim. Law § 12-101(d) .......................................... *passim*

Md. Code, Crim. Law § 12-110 ............................................... *passim*

Md. Code, Crim. Law § 12-113(a) ................................................. 15

Md. Code, Crim. Law § 12-301(1)(ii)(2) .................................................. 19

Md. Code., State Gov't § 9-1A-03 .......................................................... 9

Md. Code., State Gov't § 9-1A-04 .......................................................... 10

Md. Code., State Gov't § 9-1A-05 .......................................................... 10

Md. Code, State Gov't § 9-1A-24(e)(1) .................................................. 11

Md. Code., State Gov't § 9-1A-33 .......................................................... 10

**Other Authorities**

Federal Rule of Evidence 201(b) ............................................................ 6

Mark D. Griffiths, *Gaming Convergence: Further Legal Issues and Psychosocial Impact*, 15 Gaming L. Rev. & Econ. 461 (2011) ....... 31

Robert Kolker, *One Nerd to Rule Them All*, Bloomberg Businessweek (March 5, 2015), http://bloom.bg/1USiIUJ ............. 6

Chris Korman, *University of Maryland Launches Problem Gambling Center*, Balt. Sun (Sept. 30, 2012), http://bsun.md/1VFuV0c .............................................................. 10

Maryland Center of Excellence on Problem Gambling, *Facts*, http://www.mdproblemgambling.com/facts/ .................................. 11

Maryland Center of Excellence on Problem Gambling, *What is a Gambling Problem*, http://www.mdproblemgambling.com/what-is-a-gambling-problem/ ...................................................................................... 25

Md. Code Regs. 36.03.06.02 .................................................................. 11

Md. Code Regs. 36.03.07.07 .................................................................. 10

Leslie Picker, *Machine Zone Said in Talks at $6 Billion Value After Upton Ads*, Bloomberg Business (July 14, 2015), http://bloom.bg/1JfZcdG ..................................................... 6

S.B. 495, Fiscal and Policy Note, Gen. Assemb. 2015 Sess. (Md. 2015), http://1.usa.gov/1Rtaa8Q............................................. 10

Natasha Dow Schüll, *Addiction by Design: Machine Gambling in Las Vegas* (2014)..................................................... 25, 26

Randall Stross, *I'm Losing Money. So Why Do I Feel So Good?*, N.Y. Times (Jan. 12, 2013), http://nyti.ms/10q47Ix...................... 29

*South Park: Freemium Isn't Free* (Comedy Central television broadcast Nov. 5, 2014), http://on.cc.com/1UPoEhq ....................... 5

U.S. Patent Application No. 13/471129 (filed May 14, 2012), http://1.usa.gov/1na0MLa ...................................................... 6, 7, 17

U.S. Patent & Trademark Office, Abstract of Title for Patent Application No. 13/471129, http://1.usa.gov/237l1Jy ..................... 6

*Wheel of Fortune*, Dictionary.com, http://dictionary.reference.com/browse/wheel-of-fortune .............. 17

Nick Wingfield, *Free Video Games Say Pay Up or Wait, Testing Players' Patience*, N.Y. Times (July 5, 2014), http://nyti.ms/1zfY4oE ................................................... 5

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because (a) at least one member of the putative class is a citizen of a state different from defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under the subsection apply to this action.

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 because Ms. Mason appeals the district court's dismissal of her case with prejudice, a final judgment that disposed of all parties' claims. That judgment was entered on October 21, 2015, (JA 65), and Ms. Mason timely filed her Notice of Appeal on November 19, 2015, (JA 66).

## ISSUE PRESENTED FOR REVIEW

Whether the district court erred in holding that plaintiff failed to state a claim under Maryland's gambling loss recovery statute, Md. Code, Crim. Law § 12-110, when she sought to recover real money she lost playing a computerized "wheel of fortune"-type game of chance in defendant's mobile app casino.

## STATEMENT OF THE CASE

Plaintiff-Appellant Mia Mason brought this action to recover monetary losses she incurred as a result of wagering money in Defendant-Appellee Machine Zone, Inc.'s "Game of War Casino," an unlicensed, unlawful game of chance made available to Maryland consumers through a smartphone app. The Game of War Casino allows players to purchase spins on a "wheel of fortune" for the chance to win prizes. Some of the prizes are worth more than the cost of the spin, while others are worth less. Although Machine Zone hides the real money that players spend behind layers of virtual currency, the Game of War Casino is, at its core, gambling. And consistent with the Maryland General Assembly's goal of making illegal gambling operations unprofitable, Ms. Mason seeks to exercise her statutory right to recoup the money she lost to Machine Zone at the Game of War Casino.

## I.     Game of War and the Game of War Casino.

Game of War is an extremely popular mobile strategy game and one of the top-grossing apps on both the Apple and Android platforms. (JA 5 ¶ 1; Dkt. 7-1 at 5.). In the game, players create virtual towns and

armies, and battle other Game of War players. (JA 5 ¶ 1.) Doing so requires gathering resources, like "wood" or "stone," and then using those resources to achieve in-game goals, like building a fort. (JA 10 ¶ 28.)

However, unlike traditional video games that charge an up-front purchase fee, Game of War is a so-called "freemium" game, meaning that while it is nominally free to play, players can advance faster and further by spending real money while playing. (JA 5-6 ¶ 2; JA 11 ¶ 20; JA 15 ¶ 33.) Although it is possible to slowly accumulate virtual items without paying, Machine Zone encourages players to spend real-world dollars to purchase "Gold"—Machine Zone's in-game currency—and exchange their Gold for the items instead. (JA 5-6 ¶ 2; JA 11 ¶ 20.) Criticism of this pay-or-wait model has been aired in media outlets ranging from the highbrow, *see* Nick Wingfield, *Free Video Games Say Pay Up or Wait, Testing Players' Patience*, N.Y. Times (July 5, 2014), http://nyti.ms/1zfY4oE, to the lowbrow, *see South Park: Freemium Isn't Free* (Comedy Central television broadcast Nov. 5, 2014), http://on.cc.com/1UPoEhq.

Machine Zone sells Gold starting at a price of $4.99 for 1,200 Gold and rising to $99.99 for 20,000 Gold. (JA 12 ¶ 24.) These Gold sales add up: one estimate puts Machine Zone's revenue at over a million dollars *a day*. Leslie Picker, *Machine Zone Said in Talks at $6 Billion Value After Upton Ads*, Bloomberg Business (July 14, 2015), http://bloom.bg/1JfZcdG. Remarkably, however, just three percent of players account for all Gold purchases. Robert Kolker, *One Nerd to Rule Them All*, Bloomberg Businessweek (March 5, 2015), http://bloom.bg/1USiIUJ.

In order to attract more players to spend real money on virtual Gold, two of Machine Zone's top executives applied for a patent— subsequently assigned to Machine Zone—describing a method for adding a "virtual casino" to a freemium game to entice players to spend money "play[ing] a game of chance." U.S. Patent Application No. 13/471129 ¶¶ 6, 10, 46 (filed May 14, 2012), http://1.usa.gov/1na0MLa; U.S. Patent & Trademark Office, Abstract of Title for Patent Application No. 13/471129, http://1.usa.gov/237l1Jy.[1] Machine Zone put

---

[1]    The Court can take judicial notice of the patent application and its assignment to Machine Zone. Patent applications are public records that can be judicially noticed under Federal Rule of Evidence 201(b).

this idea into practice in Game of War by developing the Game of War Casino, a gambling game accessible from within the Game of War virtual world.

To wager in the Casino, Game of War players exchange Gold (purchased with real money) for Casino Chips. (JA 11-13 ¶¶ 21, 23, 25.) They then proceed to the Casino, which is a computerized version of the gambling game commonly called a "wheel of fortune." (JA 26 ¶ 78.) *See also* '129 Patent App. ¶¶ 145-146. Machine Zone presents players with a wheel of prizes and directs them to press a button to spin the wheel. (JA 13 ¶ 26.) Each spin costs 5,000 Casino Chips—the equivalent of $0.60 in real money. *Id*. When a player presses the button, an animated light rotates around the wheel until it stops, pointing at a prize. (JA 13-14 ¶ 27.) The player "wins" whatever prize the light lands on. (*Id*.) Players can also elect to spin the wheel in a so-called "HIGH ROLLER MODE," which increases both the stake and the potential value of the prizes. (JA

---

*Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) ("In reviewing a Rule 12(b)(6) dismissal, we may properly take judicial notice of matters of public record."); *Anderson v. Kimberly-Clark Corp.*, 507 F. App'x 927, 932 n.3 (Fed. Cir. 2014) (citing *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 954 n. 27 (Fed.Cir.1993), for the proposition that it is "well-established that a court may take judicial notice of patents or patent applications").

13 ¶ 26.) Whenever a player does not have enough Casino Chips to spin the wheel again, Machine Zone sends them to a screen where they can purchase more. (JA 12 ¶ 24.)

Wagering money at the Casino gives players a chance to instantly win game items that would cost significantly more if they were purchased outright. (*See* JA 13-14 ¶¶ 26, 28.) For example, a player has about a seven percent chance of winning 10,000 Casino Chips (at a real-world value of $1.20, twice the cost of a spin). (JA 15-16 ¶ 34 & Fig. 6.) However, Machine Zone sets the odds so that players are much more likely to "win" prizes that would have cost less real-world money if the player had simply exchanged their Gold for the items directly. (JA 15-16 ¶¶ 34-36.) Although Machine Zone terms this outcome a win, it is actually a loss, because the player receives an item worth less than the cost of a spin.

## II.  Maryland's Loss-Recovery Statute.

Maryland law provides that "[a] person who loses money at a gaming device … may recover the money as if it were a common debt[.]" Md. Code, Crim. Law § 12-110 (the "Loss Recovery Act"). The origins of the Loss Recovery Act date back over three centuries, to the Gaming

Act signed by Queen Anne in 1710, which allowed recovery of gambling losses sustained by "'gaming or playing at Cards, Dice, Tables, Tennis, Bowls or Other Game or Games.'" *Kramer v. Bally's Park Place, Inc.*, 535 A.2d 466, 469 n.3 (Md. 1988) (quoting 9 Anne, c. 14 (1710), *reprinted in* 2 Alexander's British Statutes 932 (Coe's Edition 1912)). The Loss Recovery Act "is not to help one who loses at gambling, but to discourage illegal gambling by putting the winner on notice that the courts will lend their aid to force him to disgorge his winnings." *Cates v. State*, 320 A.2d 75, 80 (Md. Ct. Spec. App. 1974).

It is true that Maryland now has some forms of legalized gambling, which is why "Maryland public policy concerning the enforceability of gambling debts and contracts largely depends on whether the type of gambling engaged in is legal or illegal." *Kramer*, 535 A.2d at 469. Legal gambling is tightly regulated, and any for-profit gambling operation not expressly licensed by the state is prohibited. Md. Code., State Gov't § 9-1A-03. Casinos are allowed only in certain locations and with a license from the state, of which only a limited

9

number are available. *Id.* § 9-1A-05 (providing that not "more than six video lottery operation licenses" may be awarded).[2]

The state, not gambling establishments, sets the rules and odds for video gaming devices. *Id.* § 9-1A-04 (giving the state regulator the power to "defin[e] and limit[] … odds for video lottery terminals and table games, the types and values of promotional items that may be given away to encourage play of video lottery terminals and table games, the method of operation of the video lottery terminals and table games, and the number and types of table games."). Casino operators pay an annual fee per video gaming terminal to support the Problem Gambling Fund, which funds the Maryland Center of Excellence on Problem Gambling at the University of Maryland. *Id.* § 9-1A-33; Chris Korman, *University of Maryland Launches Problem Gambling Center*, Balt. Sun (Sept. 30, 2012), http://bsun.md/1VFuV0c. They must also take measures to comply with the self exclusion system, which allows Marylanders to add themselves to a state registry that bars them from entering casinos. Md. Code Regs. 36.03.07.07. And all Maryland

---

[2]    Public records indicate that Machine Zone is not among Maryland's six casino license holders. S.B. 495, Fiscal and Policy Note 7, Gen. Assemb. 2015 Sess. (Md. 2015), http://1.usa.gov/1Rtaa8Q.

gambling facilities are required to "establish a responsible gaming plan that sets forth the facility's plan for addressing problem gambling at the facility," which must include staff training and "[p]lacement of responsible gambling awareness materials in the facility[.]" Md. Code Regs. 36.03.06.02.

Importantly, these regulations—and the Loss Recovery Act—exist to protect Marylanders from the problems that arise from unregulated gambling, especially the devastating problem of gambling addiction, which affects more than 150,000 adults statewide. Maryland Center of Excellence on Problem Gambling, *Facts*, http://www.mdproblemgambling.com/facts/; *see also* Md. Code, State Gov't § 9-1A-24(e)(1) (explaining obligation to "to reduce or mitigate the effects of problem gambling").

## III.  Ms. Mason's Experience and the Proceedings Below.

Between early 2014 and January 2015, Plaintiff-Appellant Mia Mason lost over $100 in the Game of War Casino. (JA 18 ¶ 43.)[3] Machine Zone took her money in exchange for the opportunity to spin

---

[3]    Although Ms. Mason's complaint simply states that she "lost more than $100" (JA 18 ¶ 43), the actual amount of her loss is considerably higher than that.

the wheel of fortune and awarded Ms. Mason prizes that resulted in a net loss for her. (JA 15-16 ¶¶ 33-35; JA 27 ¶ 83.)

On April 17, 2015, Ms. Mason filed this case against Machine Zone, seeking to recover her losses under the Maryland Loss Recovery Act. The district court dismissed her claim on October 21, 2015, holding that Ms. Mason could not recover because she "did not lose money while playing in the Casino." (JA 61.) Despite the fact that Ms. Mason paid real money for Gold and exchanged that Gold for Casino Chips, the district court held that losing Casino Chips while gambling was not losing money. (JA 57.) In dicta, the court showed palpable disdain for Ms. Mason's claim, "express[ing] its disapproval of lawsuits … like this one" and stated it believed the case to be about the need to maintain the "distinction between that which is pretend and that which is real and true." (JA 63 & n.20.) Ms. Mason timely appealed. (JA 66.)[4]

---

[4]    In the district court, Ms. Mason also alleged violations of a California statute and common law unjust enrichment. While those claims were also dismissed, Ms. Mason does not appeal those determinations.

## SUMMARY OF THE ARGUMENT

The Game of War Casino is an unlawful gaming device at which Ms. Mason lost money, and as such, she is entitled to recover those losses from Machine Zone under the Maryland Loss Recovery Act. Md. Code, Crim. Law § 12-110(a).

The Game of War Casino is a prohibited "gaming device" for two independent reasons. First, it is a "wheel of fortune," which is expressly included in a statutory list of prohibited gaming devices. Md. Code, Crim. Law § 12-101(d)(2). Second, it meets the broader statutory definition of "gaming device" because it is a "game or device at which money or any other thing or consideration of value is bet, wagered, or gambled." *Id.* § 12-101(d)(1)(ii). Machine Zone's in-game currency, Gold and Casino Chips, are "thing[s] … of value" both because they have a real-world dollar value, and because they represent purchased entertainment, which has value on its own. Players "gamble" those items at the Game of War Casino because they use them to play a game of chance at which a reward can be obtained.

In addition, Ms. Mason lost money at the Casino. Although Machine Zone disguises the fact that players are spending real money

13

by creating different types of virtual currency, that does not change the fact that players *are* spending real money, then losing it at a game of chance. Because Ms. Mason paid money to spin the wheel of fortune at the Casino, then "won" prizes that were worth less than the amount of money she spent to spin the wheel, she lost the difference and is entitled to recover it.

## STANDARD OF REVIEW

The grant of a motion to dismiss under Rule 12(b) is reviewed *de novo. Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 505 (4th Cir 2015). On appeal, the Court assumes all facts alleged in the complaint to be true and construes them in the light most favorable to the plaintiff. *Id.* at 508-09, 511.

## ARGUMENT

To recover gambling losses in Maryland, a plaintiff must prove that she (1) played at an illegal "gaming device" and (2) lost money doing so. Md. Code, Crim. Law § 12-110(a); *see Kramer*, 585 A.2d at 395 (gambling debts are unenforceable where gambling is illegal). In allowing citizens to recover gambling losses, the legislature sought to discourage games that "tend in any degree to promote a gambling

spirit." *Ballock v. State*, 20 A. 184, 185 (Md. 1890); *see also F.A.C.E. Trading, Inc. v. Todd*, 903 A.2d 348, 356 (Md. 2006). To achieve that goal, "it is incumbent upon the courts … to construe liberally statutes aimed and intended to prevent gambling." *F.A.C.E. Trading*, 903 A.2d at 356 (quoting *Gaither v. Cate*, 144 A. 239, 240 (Md. 1929)); *accord* Md. Code, Crim. Law § 12-113(a) ("[T]he court shall construe liberally this title relating to gambling and betting to prevent the activities prohibited."). Courts must therefore construe the Loss Recovery Act "as to give validity not only to the word, but to the spirit of the law." *F.A.C.E. Trading*, 903 A.2d at 355 (quoting *Gaither*, 144 A. at 240).

In dismissing Ms. Mason's case, the district court ignored the binding requirement to construe Maryland's anti-gambling laws liberally. Instead, it read the law narrowly and came to the erroneous conclusion that the Game of War Casino—despite being a prohibited wheel of fortune—is not a gaming device. To the contrary, however, the Game of War Casino *does* meet the statutory definition of a "gaming device," both because it is a prohibited wheel of fortune and because the Casino Chips that it charges players to spin the wheel are things of

value. Since Ms. Mason lost money playing the Game of War Casino, she is entitled to recover her losses from Machine Zone.

## I.     The Game of War Casino Is a Gaming Device.

Under Maryland law, a "gaming device" is "a game or device at which money or any other thing or consideration of value is bet, wagered, or gambled" and specifically "includes a … wheel of fortune[.]" Md. Code, Crim. Law § 12-101(d). The "gaming device" requirement exists "for clarity and to make explicit that civil recovery of a gambling loss is allowed under this section only when the gambling that produced the loss was illegal." Md. Code Ann., Crim. Law § 12-110, Revisor's Note. It does not exist to create a loophole allowing illegal gambling on novel devices. Therefore, "gaming device" applies broadly to any game that can be adapted for the purposes of gambling. *See F.A.C.E. Trading*, 903 A.2d at 355.

The Game of War Casino is a "wheel of fortune," which should end the inquiry. But even if it does not, the Game of War Casino otherwise fits the statutory definition of "gaming device" because the Casino Chips with which players "bet, wager[], or gamble[]" are "thing[s] … of value."

16

### A.    The Game of War Casino is a "wheel of fortune."

The statutory definition of "gaming device" *specifically* includes a "wheel of fortune." Md. Code, Crim. Law § 12-101(d)(2). A wheel of fortune is "a wheel-like gambling device that is rotated or spun to determine the winner of certain prizes." *Wheel of Fortune*, Dictionary.com, http://dictionary.reference.com/browse/wheel-of-fortune.

That's exactly how the Game of War Casino works. Players pay money (via the money-to-Gold, Gold-to-Chips process) to push a button that causes a virtual spinner to spin and point to a prize. The action of the spinner is random, and the players have no way to control where it lands or what prize they get. (JA 26 ¶ 80.) That the game is a wheel of fortune is confirmed by Machine Zone's patent, which expressly details a "'wheel of fortune' style game" where players "simply command the wheel for a chance to win." '129 Patent App. ¶ 146. Because the Game of War Casino is an electronic version of a wheel of fortune that is nearly identical in form and function to its traditional mechanical counterpart—it takes money, it spins, and it gives out prizes of varying value—it is a gaming device under § 12-101(d)(2).

17

**B.    The Game of War Casino is a game at which things of value are gambled.**

In addition to being a "gaming device" because it is a wheel of fortune, the Game of War Casino is a "gaming device" under the statute's broader definition because it is "[1] a game or device [2] at which money or any other thing or consideration of value [3] is bet, wagered, or gambled." Md. Code, Crim. Law § 12-101(d)(1)(ii).

To start, there can be no serious doubt that the Game of War Casino is a "game." No further discussion is required on that element. Next, Casino Chips are "thing[s] … of value" for at least two independent reasons: (1) Machine Zone sells and consumers buy them for real money (via the cash-to-Gold-to-Chips transaction), and (2) they provide purchased entertainment, which has value in itself. Finally, Casino Chips are "bet, wagered, or gambled" because players use them to obtain a chance at receiving an item that would cost more money than the Chips, at the risk of receiving something that would have cost less money. Therefore, even setting aside that wheels of fortune are specifically identified in the statute, the Game of War Casino meets all of the more general criteria of a gaming device.

18

### 1. Casino Chips have real-dollar value attached to them.

The district court's crucial error in this case was to hold that "there is no real-dollar value" attached to Casino Chips because they cannot be redeemed for cash. (JA 49.) Clearly the thing wagered does not have to *be* money, as the statute speaks of "money *or* any other thing or consideration of value." Md. Code, Crim. Law § 12-101(d)(1)(ii). *See also Hoile v. State*, 948 A.2d 30, 41 (Md. 2008) ("The word 'or' is a disjunctive conjunction which serves to establish a relationship of contrast or opposition."); *Clerk of Circuit Court v. Chesapeake Beach Park, Inc.*, 248 A.2d 479, 485 (Md. 1968) (refusing to construe a provision in a Maryland gambling statute restrictively, even where the statute used "and" instead of "or"). But neither does the statute require that the thing or consideration of value wagered be *exchangeable* for money. Indeed, as evidenced by Maryland's definition of "slot machine," the legislature knows how to include a requirement that players be able to cash out their winnings when it wants to. *See* Md. Code, Crim. Law § 12-301(1)(ii)(2) (including as an element of a slot machine the ability to win "money, a token, or other object that represents or can be *converted into money*") (emphasis added). The absence of similar

19

language here means there is no such requirement that the items

wagered and won on a "gaming device" (in contrast to a "slot machine")

be exchangeable for money. *See Fosler v. Panoramic Design, Ltd.*, 829

A.2d 271, 278-79 (Md. 2003) (holding that where a provision was

present in one subtitle of a statutory scheme and absent in another, it

was "obvious" that the General Assembly did not intend the provision to

apply where it was absent).

Thus, entering into a wager for merchandise or store credit has

long been considered gambling. *See, e.g.*, *Hook v. Boteter*, 3 H. & McH.

348, 349 (Md. 1793) (finding that gambling had occurred when bets

were made in store credit); *State v. 158 Gaming Devices*, 499 A.2d 940,

951 (Md. 1985) ("a device which, for a price, and based upon chance,

offers a monetary *or merchandise reward* to the successful player" is

clearly a gambling device) (emphasis added). That's because the *value* of

an item has nothing to do with whether it can be immediately and

lawfully exchanged for a cash payment. Rather, the "market value" of

an item is "a value determined by the price that a willing buyer would

pay a willing seller." *United States v. Armstead*, 524 F.3d 442, 445 (4th

Cir. 2008); *accord Exxon Mobil Corp. v. Albright*, 71 A.3d 30, 90 (Md.

20

2013). Here, Game of War players willingly buy, and Machine Zone willingly sells, virtual Gold—essentially store credit—for real money, and players use that Gold to buy Chips. To say that Casino Chips have no real-dollar value when they are purchased with Gold that Machine Zone sells for $4.99 to $99.99 is clear error.

That there is a real-dollar value attached to Casino Chips, Gold, and other virtual items is further evidenced by a burgeoning secondary market for Game of War accounts. Players' accounts are regularly listed for sale on auction websites such as eBay, with accounts containing large amounts of Gold and Casino Chips fetching higher prices. (JA 17 ¶ 38.) While the district court noted that Machine Zone's Terms of Service deny players a property right in or the ability to sell Gold and Casino Chips (JA 49), restrictions on the sale or ownership of an item have no impact on whether the item has value. For example, it is impossible to have a property right in items that are "contraband per se," like certain narcotics, and those items are certainly illegal to sell. *Helton v. Hunt*, 330 F.3d 242, 247 (4th Cir. 2003) (citing *Cooper v. City of Greenwood*, 904 F.2d 302, 305 (5th Cir. 1990)). Nevertheless, such "illegitimate" goods are bought and sold by willing participants on the

21

"black market," *Armstead*, 524 F.3d at 445, and courts regularly consider them to have value. *See, e.g.*, *State v. Smith*, 117 A.3d 1093, 1137 (Md. 2015) (noting "street value" of illegal drugs); *United States v. Moore*, 769 F.3d 264, 266 (4th Cir. 2014) (same).

Even if players have no property right in Gold and Casino Chips and are contractually prohibited from selling them once purchased, there are still markets—both legitimate and purportedly illegitimate— where willing buyers and willing sellers transact Gold and Casino Chips in exchange for real money. In the "legitimate" market, Machine Zone is the only seller, and it sells Gold and Casino Chips to players at prices that it sets in real-world dollars. In secondary markets, players sell their accounts, and the price of an account is linked to the quantity of Gold and Casino Chips in the account. Either way, Gold and Casino Chips have a value not just in the game, but in actual U.S. greenbacks.

### 2.    Casino Chips represent purchased amusement, which is itself a thing of value.

Even if there were no real-world dollar value attached to Casino Chips, they would still be "thing[s] … of value" within the statutory definition of "gaming device" because—in the words of the Maryland

Court of Appeals—"amusement is a thing of value." *Gaither*, 144 A. at 243. *Gaither* is illustrative, and warrants some discussion here.[5]

In *Gaither*, the defendant operated a device that was ostensibly a vending machine selling five-cent mints. After putting a nickel in the machine, the patron pulled a lever, which caused cylinders with pictures of fruit and other symbols to begin spinning. Pulling the lever also dispensed the mints. In addition to the mints, however, the machine would dispense between zero and twenty brass tokens. Those tokens could then be inserted back into the machine for another chance to spin the wheels and win more tokens, but no additional mints. The number of tokens dispensed depended on the outcome of the prior spin. *Id.* at 241.

The tokens had no value other than to allow for another spin of the wheels. Indeed, the tokens were expressly marked "of no value, not redeemable" on one side, and "for amusement only" on the other. *Id.* The face of the machine also expressly stated: "These tokens or slugs

---

[5]    Although *Gaither* is over eighty years old, it is regularly cited by the Maryland Court of Appeals and remains good law. *See, e.g.*, *Chesapeake Beach Park*, 248 A.2d at 483-84; *158 Gaming Devices*, 499 A.2d at 950; *State v. Crescent Cities Jaycees Found., Inc.*, 624 A.2d 955, 960 (Md. 1993); *Chesapeake Amusements, Inc. v. Riddle*, 766 A.2d 1036, 1044 (Md. 2001); *F.A.C.E. Trading*, 903 A.2d at 355.

put in the machine will not be redeemed in cash or merchandise and machine will not dispense mints for brass tokens. They are for the amusement of patrons only." *Id*. Nevertheless, despite the fact that the tokens had no independent value, and were not redeemable for cash or merchandise, the Maryland Court of Appeals held that the machine was an unlawful gambling device. *Id*. at 244.[6]

In so holding, the Court explained that "amusement is a thing of value," and that the amusement offered by the machine was "not furnished to all patrons at the same cost." *Id*. at 243. For example, because patrons receive different numbers of brass tokens based on the random outcome of the spinning wheels, "the result of the expenditure of … two nickels by … two supposed operators, in so far as the amusement feature is concerned, would be totally different, and would be entirely dependent upon chance." *Id*. at 244.

The Game of War Casino is functionally equivalent to the device in *Gaither*. Consumers, including Ms. Mason, can pay real-world money to play in the Game of War Casino, just as the operators of the candy

---

[6]    There was some discussion that the tokens could be illegally used to obtain free calls from pay telephones, but that fact was irrelevant to the court's holding. *See Gaither*, 144 A. at 242-244.

machine inserted a nickel. And, as in *Gaither*, one Game of War Casino player may, by operation of chance, "get ten times as much amusement as another who spends the same amount and goes through identically the same operation." *Gaither*, 144 A. at 244. That game of chance, where the wager and the prize consist of additional entertainment that would otherwise cost money, is gambling. *Id.*

Indeed, wagering with "something of whimsy," (JA 57), whether it be Gold or movie tickets, carries the same risks as more traditional gambling. That's because gambling addiction has little to do with winning money. Gambling addicts gamble because they have a "devastating medical condition" that causes them to be unable to stop "any activity that involves risking something of value, including but not limited to money or property, on an event whose outcome is uncertain." Maryland Center of Excellence on Problem Gambling, *What is a Gambling Problem*, http://www.mdproblemgambling.com/what-is-a-gambling-problem/. Machine gamblers' "aim is not to *win* but simply to *continue*" so they can stay in what has been termed—curiously enough—"that machine zone, where nothing else matters;" where "time, space, and social identity are suspended in the mechanical rhythm."

25

Natasha Dow Schüll, *Addiction by Design: Machine Gambling in Las Vegas* 2, 12-13 (2014) (emphasis in original). "[I]t is not the chance of winning to which [machine gamblers] become addicted; rather, what addicts them is the world-dissolving state of subjective suspension and affective calm they derive from machine play." *Id.* at 19. All the while, they keep feeding money into the machine, destroying families and causing financial ruin. *See generally id.* at 189-234.

The *Gaither* court recognized that feeding money into the machine is the reason device creators include a gambling element in their games. In words that could apply just as easily to the Game of War Casino, the Maryland Court of Appeals stated that "[t]here is no doubt in our mind that the real purpose of placing these machines, to be played and operated by the public, is to increase the sales of the merchandise by appealing to the gambling instinct, which is either active or latent in almost every individual." *Gaither*, 144 A. at 243.

The district court here concluded that Gold and Casino Chips couldn't be gambled because they are similar to "cinema or amusement park tickets" that are purchased "for the pleasure of entertainment *per se*, not for the prospect of economic gain." (JA 57.) The comparison itself

is accurate; people buy movie tickets for the same reason that they buy Gold and Casino Chips—because it's fun. The conclusion drawn by the lower court from that comparison, however, is wrong. The whimsical nature of Gold and Casino Chips do not automatically render them valueless.

Taking a position directly contrary to that of the district court here, the *Gaither* court invoked the exact same comparison: movie tickets. The court considered a hypothetical device that it found to clearly offer gambling: one identical to the vending machine operated by the defendant, except that the brass tokens could be redeemed for movie tickets. *Gaither*, 144 A. at 244. The *only* difference between the real device and the hypothetical device was that hypothetical tokens had "freestanding value apart from their contribution to gameplay," while the real tokens could only be used within the device to make the cylinders spin. (*See* JA 62.) The court held that "there is no essential difference between these two cases," and that both are gambling devices. *Gaither*, 144 A. at 244.

The hypothetical illustrates the point that courts don't have license to decide what types of entertainment have value and what

types do not. A court's disapproval of the particular form of entertainment provided by Game of War does not render the Gold and Casino Chips used to obtain it valueless, just as a court's disapproval of the artistic merits of a certain film doesn't change the value of a movie ticket. Standing on its own, "amusement is a thing of value," regardless of what kind of amusement it is. *See id.* It necessarily follows that Gold and Casino Chips—which cost money and can be exchanged for amusement—also have value.

### 3. Casino Chips are "bet, wagered, or gambled."

Finally, players in the Game of War Casino "gamble[]" their Casino Chips. The three elements of gambling are "consideration, chance, and reward," *F.A.C.E. Trading*, 903 A.2d at 356 (quoting *158 Gaming Devices*, 499 A.2d at 951), and are all present here. There is consideration because, as discussed above, Casino Chips have value. There is chance, because the outcome of spinning the Game of War Casino's wheel of fortune is dependent on odds selected by Machine Zone, not on any skill of the player. (JA 14-15.) And there is reward: players win prizes depending on the outcome of the spin, some of which

are common "resources" used to advance game play while others are high-value items such as additional Casino Chips or Gold. (JA 13-14.)[7]

The presence of consideration, chance, and reward in the Game of War Casino ensures that "the evils inherent in gambling" are present here, and Maryland law must be "be liberally construed to prevent" those evils. *See F.A.C.E. Trading*, 903 A.2d at 356. Other than the limited exception for licensed casinos that comply with the myriad regulations designed to protect Marylanders from the ills of problem gambling, running such an operation is illegal in Maryland. Machine Zone doesn't have a casino license, doesn't adhere to Maryland's casino self-exclusion list, doesn't provide players with materials about gambling addiction, doesn't pay casino taxes to Maryland to fund gambling addiction research, and continues to deny that it even offers gambling.

---

[7]     The fact that a player always "wins" a prize does not remove the Game of War Casino from the realm of gambling. Indeed, it can make the Casino even *more* problematic. *See* Randall Stross, *I'm Losing Money. So Why Do I Feel So Good?*, N.Y. Times (Jan. 12, 2013), http://nyti.ms/10q47Ix (explaining that new gambling games can be "more addictive than an older, single-line slot machine ... because they produce not just clear wins and clear losses but also 'false wins,' in which players receive less than they've bet").

Ultimately, Machine Zone can't hide the real-world cash behind layers of virtual money with whimsical names and pretend that they're not offering a gambling game. As discussed above, the upside for many gamblers isn't the prospect of winning a jackpot; it's the feeling of being in the "machine zone" and spending money on a game of chance. That's what Machine Zone offers its players, and it can lead to financial ruin. Maryland's anti-gambling regime exists to make sure that companies like Machine Zone can't make money pushing their illegal games, and this Court must enforce it.

## II.    Ms. Mason Lost Money at the Game of War Casino.

The district court incorrectly held that Ms. Mason "did not lose money while playing in the casino" because she "was not wagering with *dollars*; she was playing with *virtual gold*." (JA 57, 61) (emphasis in original). But it had no basis to conclude that Ms. Mason's losses of virtual currency were "pretend" as opposed to "real and true." (*See* JA 63.) Machine Zone charges *real money* for Gold and sells a million dollars worth of it every day. If Ms. Mason wanted to replace the Casino Chips that she lost at the Game of War Casino, she would have to pay Machine Zone real money. She therefore lost that money at the Casino.

The district court raised the objection that because virtual currency and merchandise are involved, it would be difficult for the jury to figure out whether Ms. Mason lost money. (JA 16.) In fact, it is trivially easy. Machine Zone sells Gold for a specific cost in real-money terms, and it sells all of its other items for a specific cost in terms of Gold. Given that 1200 Gold costs $4.99, it is a simple calculation to determine how much real money something would cost given its price in Gold. For example, 7,000 Casino Chips cost 200 Gold. That means that one spin at the Casino, which costs 5,000 Casino Chips, is equivalent to 143 Gold, which itself costs $0.60. The price of any other Game of War item could be figured the same way, posing no difficulty.[8]

Enterprising individuals may have invented clever new ways to allow people to gamble—one psychologist even called freemium games a "psychological masterstroke," Mark D. Griffiths, *Gaming Convergence: Further Legal Issues and Psychosocial Impact*, 15 Gaming L. Rev. &

---

[8]    In any event, it is constitutionally dubious for a federal court to dismiss a claim as a matter of law because its resolution might prove difficult for the factfinder. *See City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 743-44 (1999) ("Some plaintiffs' cases are easy and some are difficult, but the difficult ones are no different in front of a jury … Neither the Fifth nor the Seventh Amendment has ever been thought to shift and spring with ease of proof.") (Souter, J., concurring in part and dissenting in part).

Econ. 461, 463 (2011)—but that doesn't change the intent of the General Assembly nor the courts' duty to enforce it. *See Gaither*, 144 A. at 243 (rejecting "the belief of people engaged in an endeavor to violate the spirit but keep the letter of the statutes prohibiting gambling that courts are blinded to facts which all others of average intelligence see and understand"). Even if the district court believes that Ms. Mason was foolish to spend her money to purchase Casino Chips, that doesn't negate the fact that she lost that money at a gambling game. Under Maryland law, she is entitled to recover it.

## CONCLUSION

Because the Game of War Casino is a game or device at which Ms. Mason wagered a thing of value and lost money, she states a claim under Md. Code, Crim. Law § 12-110. The district court's judgment in favor of Machine Zone should be vacated and the case remanded for further proceedings.

## REQUEST FOR ORAL ARGUMENT

Because the Court's decisional process would be significantly aided by oral argument, Ms. Mason respectfully requests that oral argument be heard in this case.

Dated: February 1, 2016          Respectfully submitted,

**MIA MASON,**

By: s/ Alexander G. Tievsky
*One of Plaintiff-Appellant's Attorneys*

Ryan D. Andrews
randrews@edelson.com
Roger Perlstadt
rperlstadt@edelson.com
Alexander G. Tievsky
atievsky@edelson.com

EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App.

P. 32(a)(7)(B) because this brief contains 6,256 words, excluding the

parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)

because this brief has been prepared in a proportionally spaced

typeface, 14-point Century Schoolbook, using Microsoft Word for Mac

2011.

Dated: February 1, 2016          s/ Alexander G. Tievsky

## ADDENDUM

### Md. Code, Crim. Law § 12-101(d)

(1) "Gaming device" means:

(i) a gaming table, except a billiard table, at which a game of chance is played for money or any other thing or consideration of value; or

(ii) a game or device at which money or any other thing or consideration of value is bet, wagered, or gambled.

(2) "Gaming device" includes a paddle wheel, wheel of fortune, chance book, and bingo.

### Md. Code, Crim. Law § 12-110

(a) A person who loses money at a gaming device that is prohibited by this subtitle, Subtitle 2 of this title, or Title 13 of this article:

(1) may recover the money as if it were a common debt; and

(2) is a competent witness to prove the loss.

(b) Notwithstanding subsection (a) of this section, a person may not recover money or any other thing that the person won by betting at a gaming device prohibited by this subtitle, Subtitle 2 of this title, or Title 13 of this article.

### Md. Code, Crim. Law § 12-113(a)

The Office of the Attorney General, the State Lottery and Gaming Control Commission, the Department of State Police, local law enforcement units, and the court shall construe liberally this title relating to gambling and betting to prevent the activities prohibited.

**Md. Code, State Gov't § 9-1A-03**

(a) Except as provided in subsection (b) of this section, any additional forms or expansion of commercial gaming other than as expressly provided in this subtitle are prohibited.

(b) This subtitle, including the authority provided to the Commission under this subtitle, does not apply to:

    (1) lotteries conducted under Subtitle 1 of this title;

    (2) wagering on horse racing conducted under Title 11 of the Business Regulation Article;

    (3) the operation of slot machines as provided under Titles 12 and 13 of the Criminal Law Article; or

    (4) other gaming conducted under Titles 12 and 13 of the Criminal Law Article.

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2016, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system. I further certify that the foregoing was served on all parties or their counsel of record through the CM/ECF system.

<u>s/ Alexander G. Tievsky</u>
*One of Plaintiff-Appellant's Attorneys*